Nos. 24-2184, 24-2185, 24-2189, 24-2194, 24-2202, 24-2203, 24-2256, 24-2257

# 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals
### *for the*
# 𝔗hird 𝔆ircuit

———————◆———————

IN RE LIPITOR ANTITRUST LITIGATION

MEIJER INC., *et al.*,

Appellants

v.

PFIZER INC., *et al.*,

Appellees

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY, Nos. 3:12-cv-04537, 3:12-cv-02389, 3:13-cv-02478,
3:12-cv-07561, 3:-18-cv-12437, 3:12-cv-04422, & 3:12-cv-02612

═══════════════════════════════════════

## BRIEF OF APPELLEES RANBAXY INC., RANBAXY PHARMACEUTICALS, INC., AND RANBAXY LABORATORIES LTD.

═══════════════════════════════════════

GEORGE W. HICKS, JR.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

JAY P. LEFKOWITZ
DEVORA W. ALLON, P.C.
GILAD BENDHEIM
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for Appellees Ranbaxy Inc., Ranbaxy Laboratories Limited,
and Ranbaxy Pharmaceuticals, Inc.*

═══════════════════════════════════════

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1, Appellees Ranbaxy Inc., Ranbaxy Laboratories Ltd., and Ranbaxy Pharmaceuticals, Inc. (together, "Ranbaxy") state as follows:

The ultimate parent company of Ranbaxy Inc. is Sun Pharmaceutical Industries Ltd. Ranbaxy Inc. is a subsidiary of Sun Pharmaceutical Industries Ltd., which is a publicly traded company.

Effective March 24, 2015, Ranbaxy Laboratories Ltd. merged with Sun Pharmaceutical Industries Ltd., which is the sole surviving entity of that merger. Sun Pharmaceutical Industries Ltd. is a publicly traded company and has no parent company.

Effective August 1, 2017, Ranbaxy Pharmaceuticals, Inc., merged with Sun Pharmaceutical Industries, Inc., whose ultimate parent is Sun Pharmaceutical Industries Ltd. Sun Pharmaceutical Industries, Inc., is a subsidiary of publicly traded Sun Pharmaceutical Industries Ltd.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES .......................................................................... iv

INTRODUCTION ...................................................................................... 1

COUNTERSTATEMENT OF THE ISSUES ........................................................ 5

STATEMENT OF THE CASE ........................................................................ 4

    A.    Statutory and Regulatory Background ................................................ 5

    B.    Factual Background ........................................................................ 8

    C.    Procedural History ...................................................................... 16

SUMMARY OF ARGUMENT ...................................................................... 19

STANDARD OF REVIEW .......................................................................... 23

ARGUMENT .......................................................................................... 25

I.    Appellants Lack Antitrust Standing Because They Have Failed To Create A Genuine Issue Of Material Fact That It Was More Likely Than Not That FDA Would Have Approved Ranbaxy's ANDA Before November 30, 2011 ....................................................................... 25

    A.    Appellants Bear the Burden of Establishing Through Specific or Concrete Evidence, Not Speculation, That It Is More Likely Than Not That FDA Would Have Approved Ranbaxy's ANDA Before November 30, 2011. ................................. 25

    B.    Appellants Failed to Provide Specific Or Concrete Evidence that Ranbaxy Would Have Obtained FDA Approval Before November 30, 2011. .......................................................... 29

        1.    Appellants Have Failed to Provide Specific or Concrete Evidence That FDA Would Have Granted an AIP Exception Before May 16, 2011. ..................................... 30

        2.    Appellants Have Failed to Provide Specific or Concrete Evidence That It Is More Likely Than Not

That FDA Would Have Approved Ranbaxy's ANDA Before November 30, 2011. ....................................................... 35

C.    Appellants' Remaining Arguments Lack Merit. ................................ 40

II.    The District Court Did Not Abuse Its Discretion In Limiting Summary-Judgment Practice And Discovery To The Dispositive Issue Of Antitrust Standing.............................................................. 52

CONCLUSION ....................................................................................... 56

COMBINED CERTIFICATIONS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advo, Inc. v. Phila. Newspapers, Inc.*,
 51 F.3d 1191 (3d Cir. 1995) ...............................................................46

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
 718 F.3d 236 (3d Cir. 2013) ..........................................................24, 53

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
 921 F.3d 98 (3d Cir. 2019) ............................................................24, 54

*Barr Laboratories, Inc. v. Abbott Laboratories*,
 978 F.2d 98 (3d Cir. 1992) .................................................................53

*In re Canadian Imp. Antitrust Litig.*,
 470 F.3d 785 (8th Cir. 2006) .........................................................26, 43

*D.E. v. Cent. Dauphin Sch. Dist.*,
 765 F.3d 260 (3d Cir. 2014) ...............................................................23

*DIRECTV Inc. v. Seijas*,
 508 F.3d 123 (3d Cir. 2007) ...............................................................23

*Ethypharm S.A. Fr. v. Abbott Labs.*,
 707 F.3d 223 (3d Cir. 2013) ...............................................................25

*FDA v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000)..............................................................................6

*In re Fine Paper Antitrust Litig.*,
 685 F.2d 810 (3d Cir. 1982) ...............................................................24

*In re Flonase Antitrust Litigation*,
 798 F.Supp.2d 619 (E.D. Pa. 2011)....................................................43

*Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*,
 841 F.App'x 399 (3d Cir. 2021) .........................................................24

*FTC v. Actavis, Inc.*,
 570 U.S. 136 (2013)..........................................................................5, 6

*In re Lipitor Antitrust Litig.*,
  868 F.3d 231 (3d Cir. 2017) .........................................................*passim*

*MacLean v. Wipro Ltd.*,
  2023 WL 3742832 (D.N.J. May 31, 2023) ...................................53, 55

*In re Mallinckrodt PLC*,
  2022 WL 16551333 (D. Del. Oct. 31, 2022) ......................................42

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) ..................................................................24

*Robertson v. Allied Signal, Inc.*,
  914 F.2d 360 (3d Cir. 1990) ..........................................................24, 33

*RSA Media, Inc. v. AK Media Grp., Inc.*,
  260 F.3d 10 (1st Cir. 2001) .................................................................26

*Takeda Pharm. Co. v. Zydus Pharms. (USA) Inc.*,
  358 F.Supp.3d 389 (D.N.J. 2018) ......................................................43

*Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*,
  2022 WL 952896 (E.D. Pa. Mar. 30, 2022) .......................................43

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
  868 F.3d 132 (3d Cir. 2017) ........................................................*passim*

*Wiest v. Tyco Elecs. Corp.*,
  812 F.3d 319 (3d Cir. 2016) ...............................................................23

*Young v. Martin*,
  801 F.3d 172 (3d Cir. 2015) ...............................................................23

*In re Zetia (Ezetimibe) Antitrust Litigation*,
  2022 WL 4355149 (E.D. Va. Sept. 2, 2022) ......................................43

*In re Zetia (Ezetimibe) Antitrust Litigation*,
  655 F.Supp.3d 406 (E.D. Va. 2023) ...................................................42

**Statutes**

21 U.S.C. §355(d) ......................................................................................6

21 U.S.C. §355(j)(2)(A) .............................................................................6

21 U.S.C. §355(j)(2)(A)(vii)(IV) ............................................................7

21 U.S.C. §355(j)(5)(B)(iv) ...................................................................7

21 U.S.C. §355(j)(5)(B)(iv)(II) ..............................................................8

**Regulation**

21 C.F.R. §314.107(c)(2) .......................................................................7

**Rule**

D.N.J. Local Rule 56.1(a) ....................................................................47

# INTRODUCTION

The case-dispositive issue before the district court on summary judgment presented a straightforward question: whether Appellants could proffer specific or concrete evidence that the Food and Drug Administration ("FDA") more likely than not *would* have approved generic Lipitor earlier than the launch date specified in Pfizer's and Ranbaxy's settlement agreement. The absence of such evidence was underscored by Appellants' opposition to summary judgment, which relied on a distortion of the factual record and substantively ignored Third Circuit precedent. At best, the evidence demonstrates only that the FDA hypothetically *could* have approved generic Lipitor earlier absent the agreed-upon launch date. But that is simply not enough to establish standing in an antitrust case, and, in fact, the evidence shows the opposite. As a result, Appellants lack antitrust standing under black-letter Third Circuit law. The district court correctly held as much in its lengthy, highly detailed decision, and for the reasons set forth below, that decision should be affirmed in full.

This Court has held that to establish antitrust standing, a plaintiff who contends that a settlement delayed a generic drug's launch and led to higher prices must demonstrate that its purported injuries were caused by "that which makes [the] defendants' acts unlawful." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 164 (3d Cir. 2017). A plaintiff must therefore demonstrate

through "specific or concrete evidence"—rather than mere speculation—that an earlier launch "*would* have been legal," and thus that it is more likely than not that a generic manufacturer "*would* have obtained" regulatory approval from FDA *before* the entry date in the settlement agreement. *Id.* at 165-67 (emphases added). Evidence that a generic manufacturer theoretically "*may* have been able to obtain" earlier approval, or that it was "possible" to obtain earlier approval in a hypothetical world featuring a different launch date, is insufficient to raise a triable issue of fact establishing antitrust standing and defeating summary judgment. *Id.* at 167.

Here, Defendant-Appellee Ranbaxy entered into a 2008 settlement agreement with Pfizer Inc. that allowed Ranbaxy to bring a generic version of Lipitor to the market on November 30, 2011—more than five years before expiration of the latest-expiring Lipitor patent. Appellants allege that the settlement agreement violated antitrust law because it provided for a "reverse payment" from Pfizer to Ranbaxy, delaying entry of generic Lipitor. Appellants further contend that had there been no alleged reverse payment, generic Lipitor would have been available earlier than November 30, 2011, and thus that the settlement caused them to pay higher prices for Lipitor while less-expensive generic versions were delayed. This means that to establish antitrust standing, Appellants must offer specific or concrete evidence showing that it is more likely than not that Ranbaxy or another generic manufacturer

"would have obtained" FDA approval earlier than November 30, 2011, because generic Lipitor could not legally have been sold any earlier absent such approval.

Appellants failed to satisfy their evidentiary burden on that dispositive question, warranting summary judgment. In 2009, FDA imposed its harshest—and rarely invoked—regulatory penalty against Ranbaxy, which halted its substantive review of Ranbaxy's application for generic Lipitor. While FDA's review was suspended, Ranbaxy submitted multiple major amendments to its application, requiring, in FDA's words, a "new full review" that did not begin until May 16, 2011, when the regulatory penalty was lifted. FDA then undertook an extremely accelerated review, providing approval in approximately six months—at a time when such reviews typically took two to three *years*. Even then, FDA made clear as late as November 29, 2011—one day before the agreed-upon entry date—that approval the next day was far from certain. This admonition was consistent with FDA's declining to approve other important generic drugs by agreed-upon entry dates. Because Plaintiffs cannot identify any specific or concrete evidence that FDA would have completed its already highly expedited review any faster and approved generic Lipitor any earlier than November 30, 2011, there is a "regulatory or legislative bar" that "break[s] the chain of causation" between the settlement and Appellants' alleged injuries. Appellants accordingly are unable to establish antitrust standing, requiring summary judgment. *Wellbutrin*, 868 F.3d at 165.

Appellants' arguments to the contrary are uniformly unavailing. They principally invoke evidence that FDA was aware of the November 30 entry date and considered generic Lipitor a public-health imperative. But it is sheer speculation to leap from those unremarkable premises to the conclusion that it is more likely than not that FDA *would* have approved Ranbaxy's application faster than its already highly accelerated review. Appellants otherwise attempt to pick away at the district court's well-reasoned, thoughtful analysis with incorrect or irrelevant arguments, including that the district court imposed improper legal requirements, failed to consider certain evidence, and resolved disputed facts against them. Each of these arguments ignores the dispositive nature of Appellants' wholesale failure to establish antitrust standing, and none provides any basis for reversal.

Appellants separately contend that the district court should not have front-loaded discovery and summary-judgment motion practice on the dispositive question of antitrust standing, but that argument only underscores Appellants' unwillingness to accept *Wellbutrin* and its consequences for their case. Because *Wellbutrin* controls, and Appellants have not satisfied its requirements as a matter of law, the district court's entry of summary judgment for Ranbaxy was appropriate and should be affirmed.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether Appellants lack antitrust standing because they failed to create a genuine issue of material fact that it was more likely than not that FDA would have approved Ranbaxy's generic Lipitor earlier than November 30, 2011.

2. Whether the district court abused its discretion in limiting discovery and summary-judgment practice to the dispositive issue of whether Appellants lack antitrust standing.

## STATEMENT OF THE CASE

### A.  Statutory and Regulatory Background

The 1984 Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act") governs the relationship between brand and generic manufacturers.  Under the Hatch-Waxman Act, a drug manufacturer seeking to market a brand drug must submit a New Drug Application, undergo a rigorous review process, and receive FDA approval that the drug is safe and effective.  *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 240 (3d Cir. 2017).  A generic manufacturer can "obtain similar marketing approval" by submitting an Abbreviated New Drug Application ("ANDA") demonstrating that "the generic has the 'same active ingredients as,' and is 'biologically equivalent' to, the already-approved brand-name drug."  *FTC v. Actavis, Inc.*, 570 U.S. 136, 142 (2013).

Although a generic manufacturer need not establish a generic drug's safety and effectiveness in the first instance, it nevertheless must satisfy an array of statutory obligations to ensure the drug's equivalence to the brand drug and its safety and efficacy. These requirements include that the drug has the same ingredients as, is biologically equivalent to, and employs the same labeling as the brand drug, and that the facilities and methods used to manufacture the drug will preserve its quality. *See Actavis*, 570 U.S. at 142; 21 U.S.C. §355(j)(2)(A), (4). To this end, FDA must first review an ANDA to ensure it has all the necessary components, and then perform a bioequivalence review, a chemistry/microbiology review, a labeling review, and a facility review (including on-site facility inspection). JA0037-38. Given these complexities, the median FDA review time from ANDA receipt to approval during the time period relevant to this litigation was between two and three years. JA0080.

FDA must balance competing goals when performing an ANDA review. While FDA strives to review ANDAs in a timely manner, it must ensure that generic drugs meet all statutory and regulatory requirements and are as safe and effective as approved brand drugs before they launch. *See* JA0038; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133-34 (2000) (explaining that "any product regulated by the FDA" must be "'safe' and 'effective' for its intended use"); 21 U.S.C. §355(d)(1)-(2), (4)-(5). Indeed, even where a generic and brand manufacturer agree

6

when a therapeutically important generic drug can enter the marketplace, FDA does not necessarily give ANDA approval by the agreed-upon date.  For example, Ranbaxy and Novartis agreed that Ranbaxy could first market generic Diovan in 2012, but FDA did not approve Ranbaxy's ANDA until 2014. JA2956.  Similarly, Ranbaxy and AstraZeneca agreed that Ranbaxy could first market generic Nexium in May 2014, but FDA did not approve any Nexium ANDA until January 2015. JA2957.  And Teva, Mylan, and Pfizer agreed that Teva could first market a generic epinephrine auto-injector (*i.e.*, a generic EpiPen) in 2015, but FDA did not approve Teva's ANDA until 2018.  JA2958.

Under the Hatch-Waxman Act, a generic manufacturer can challenge a brand manufacturer's patent.    A generic manufacturer's ANDA may include a certification—known as a "paragraph IV" certification—that the brand patent is invalid or will not be infringed by the generic drug.  *Lipitor*, 868 F.3d at 241; 21 U.S.C. §355(j)(2)(A)(vii)(IV).  Such certification automatically qualifies as patent infringement and often results in infringement litigation with the brand manufacturer. *Lipitor*, 868 F.3d at 241.

The first generic manufacturer to file an ANDA containing a paragraph IV certification is entitled to a 180-day exclusivity period (starting on the day of ANDA approval) during which no other generic may enter the market.  *Id.*; 21 U.S.C. §355(j)(5)(B)(iv); 21 C.F.R. §314.107(c)(1).  The exclusivity period can be lost if,

*inter alia*, FDA concludes that the ANDA was not "substantially complete" when filed. 21 U.S.C. §355(j)(5)(B)(iv)(II); JA0072; JA0074-75. A first-filing generic manufacturer may relinquish or selectively waive its 180-day exclusivity period. JA0040.

## B.  Factual Background

### 1.  The Ranbaxy-Pfizer Litigation and Settlement

Lipitor is a type of statin, which lowers cholesterol. JA0036-37. Beginning in 1987, Pfizer secured patents protecting Lipitor and its active ingredient, atorvastatin calcium. JA0037. Pfizer launched Lipitor in 1997. *Id.* In August 2002, Ranbaxy filed an ANDA for generic Lipitor containing a paragraph IV certification and obtained first-filer status. Ranbaxy's ANDA contemplated that Ranbaxy would produce an amorphous form of atorvastatin calcium, not the crystalline form used in Pfizer's Lipitor. JA0040.

In 2002, Pfizer sued Ranbaxy for patent infringement. *Lipitor*, 868 F.3d at 243. The Federal Circuit held the relevant patents were not invalid and were infringed, except for one patent claim found invalid. *Id.* Ranbaxy and Pfizer engaged in further litigation over that claim and other patents. *Id.* at 243-44.

On June 17, 2008, Ranbaxy and Pfizer executed a near-global litigation settlement agreement. JA0042. Under the settlement, Pfizer granted licenses allowing Ranbaxy to launch generic Lipitor on November 30, 2011—approximately

five years before the expiration of Pfizer's latest-expiring Lipitor patent. JA0043.

Those licenses also permitted Ranbaxy to use crystalline atorvastatin. *Id*.

### 2. FDA's Regulatory Actions Against Ranbaxy, and Ranbaxy's Major Amendments to Its ANDA

That Ranbaxy and Pfizer agreed upon a market entry date of November 30, 2011, did not guarantee that FDA would approve Ranbaxy's ANDA for generic Lipitor by that date. To the contrary, a series of significant regulatory violations made the review process for Ranbaxy's generic Lipitor even more challenging and complex than usual.

In June 2006, FDA issued a Warning Letter regarding drugs manufactured at Ranbaxy's Paonta Sahib, India facility. JA0047. The letter stated that until certain deficiencies were corrected, FDA would "recommend withholding approval of any new applications listing [Ranbaxy's] Paonta Sahib facility as the manufacturer." JA0048. One such application was Ranbaxy's Lipitor ANDA.

For the next two years, Ranbaxy sought to comply with FDA's manufacturing and data integrity practices. JA0047-52. Nevertheless, in March 2008, FDA reported continuing discrepancies in production records and inadequate operating procedures and laboratory controls. JA0050. So severe were these issues that, in April 2008, Ranbaxy stated in a federal court filing that it did not know "when the FDA will tentatively approve [its Lipitor ANDA] or whether [its ANDA] will ever be approved by the FDA." JA0051. In September 2008, FDA issued a second

9

Warning Letter and imposed a ban of generic-drug imports from the Paonta Sahib facility. *Id.* The 2008 letter stated that FDA would continue to recommend disapproval of new applications listing the Paonta Sahib facility as the manufacturing location. JA0052.

In February 2009, FDA invoked its rarely used Application Integrity Policy ("AIP") against Ranbaxy's Paonta Sahib facility. JA0054. FDA found a "practice of submitting untrue statements of material fact and other wrongful conduct," raising "significant questions regarding the reliability of the data and information contained in" Ranbaxy ANDAs containing data from the Paonta Sahib facility. *Id.* Consequently, FDA halted *all* review of *every* Ranbaxy ANDA involving the Paonta Sahib facility—including the generic Lipitor ANDA. JA0054-55. Ranbaxy submitted a proposed corrective plan, JA0056, but FDA concluded that the plan was "inadequate." JA0059. In 2010, Ranbaxy's independent auditor, Quintiles Consulting, issued a report concluding that "ANDA submissions from [the Paonta Sahib site] are not supportable without remediation." JA0064.

In December 2009 and November 2010, while the AIP was in place, Ranbaxy submitted two "major amendments" to its Lipitor ANDA that substantially changed its original application. JA0067-69.[1] In its December 2009 major amendment,

---

[1] ANDA amendments were then classified as "major," "minor," or "telephone" amendments. *See* JA5367. Submitting a "major" amendment "require[s] extensive assessment," "result[s] in reviewers having to refamiliarize themselves with the

Ranbaxy made nine changes to its ANDA, including (i) changing its atorvastatin calcium manufacturer from Paonta Sahib to a Pfizer-operated facility; (ii) adding its own New Jersey-based Ohm Laboratories as a manufacturing site; and (iii) changing the form of its atorvastatin calcium from amorphous to crystalline. JA0068. In its November 2010 major amendment, Ranbaxy made two more changes to its ANDA, including adding an atorvastatin calcium manufacturer in Toansa, India. JA0069. But because the AIP was in place, FDA did not review either of these major amendments (or the many changes they proposed) when they were submitted. JA0077.

### 3. FDA's "New Full Review" of Ranbaxy's Amended Lipitor ANDA and Approval on November 30, 2011

On May 16, 2011, FDA informed Ranbaxy that it had granted an exception to the AIP to review the generic Lipitor ANDA. *See* JA0079; JA1039-40. FDA observed in a memorandum that an exception was warranted because, among other things, the available evidence suggested that the problems at Paonta Sahib had not affected the Lipitor ANDA, and FDA believed it would be able to determine if the data in "the application as amended are reliable and whether the ANDA meets the requirements for approval." JA0078; *see also* JA1043-47.

---

application," and thus "causes a greater time lapse from when the original review was done." JA1528, JA5367.

In the memorandum, FDA acknowledged that November 30, 2011, was "the earliest date Ranbaxy could market its atorvastatin product under its 2008 settlement with Pfizer," and it proposed expedited review of Ranbaxy's amended ANDA. JA0079. But while FDA "anticipated" that its review of the amended ANDA *could* be completed by November 30, 2011, it emphasized that "[p]rompt review of the ANDA does not, of course, guarantee that the application will be ready for final approval by November 30, 2011." *Id.* Noting that "any ANDA for atorvastatin must meet the requirements" of federal law, FDA stressed that "[i]f the data are found to be unreliable, or the application otherwise does not meet the requirements for approval, FDA w[ill] not approve the ANDA." *Id.* Significantly, FDA referred to the two major amendments that Ranbaxy had submitted while the AIP was in place, and it noted that "[p]ursuant to the AIP, neither of these amendments has been reviewed." JA0077. It explained that those amendments "necessitate, in essence, a *new full review* of the main elements of the ANDA," in addition to determining that Ranbaxy's revised submissions were "free of the concerns which gave rise to the AIP." *Id.* (emphasis added).

Subsequent to May 16, 2011, FDA undertook this "new full review" on a substantially expedited basis. The process required FDA to review not just the already-extensively revised ANDA (including Ranbaxy's two "major amendments"), but also five further amendments submitted by Ranbaxy during the

12

review period.  JA0080-82.  FDA also had to review supplemental data Ranbaxy

submitted in response to five separate deficiency notices.  *Id.*  Finally, FDA had to

perform two multi-day, on-site inspections of Ranbaxy facilities, one of which

(Toansa) was in India.  *Id.*  FDA completed its labeling review on July 29, 2011, its

chemistry/microbiology review on October 21, 2011, its bioequivalence review on

October 25, 2011, its facility review for the Ohm facility on October 25, 2011, and

its facility review for the Toansa facility on November 30, 2011.  *Id.*

At least twice during this expedited process, FDA informed Ranbaxy that it

could not accommodate an approval date before November 30 or even guarantee that

approval would occur by November 30.  First, on October 26, 2011, Ranbaxy asked

that FDA provide approval two weeks before November 30.  FDA declined because

it had scheduled the Toansa site visit for November 21-25.  JA0082-83.

Second, on November 25, 2011, FDA informed Ranbaxy of concerns arising

from its Toansa site visit.  JA0083.  On a November 29, 2011, call with Ranbaxy,

FDA "acknowledged the significance of tomorrow," *i.e.*, November 30, as "the

widely anticipated launch date of generic atorvastatin."  *Id.*  But FDA told Ranbaxy

that "it did not appear that resolution of the Toansa inspection results could be

reached by tomorrow," and it would "not venture to guess when resolution would be

reached."  *Id.*  Ranbaxy asked whether "the ANDA could be approved tomorrow" if

Ranbaxy "immediately" submitted an amendment removing the Toansa site.  *Id.*

FDA responded that "it was possible, but [FDA] could not guarantee it."  JA0084.

Ranbaxy did not submit an amendment but instead submitted a response to FDA's

November 25 concerns.  *Id.*  The next day, November 30, FDA documented that it

completed its validity assessment, and it approved Ranbaxy's generic Lipitor ANDA

that same day—only six-and-a-half months after granting an exception to the AIP

and beginning its "new full review."  *Id.*

### 4.  FDA's Failure to Approve Other Generic Lipitor ANDAs Before November 30, 2011

Because nearly a decade had passed since Ranbaxy achieved first-filer status

based on its original generic Lipitor ANDA, and because the 180-day exclusivity

period stemming from that first-filer status prevented other generic manufacturers

from entering the market for generic Lipitor, FDA faced significant pressure

throughout 2011 from those other manufacturers to eliminate Ranbaxy's 180-day

exclusivity period.  JA0072-73.  In March 2011, after receiving letters from three

generic manufacturers—Apotex, Mylan, and Teva—FDA took the unusual step of

re-examining Ranbaxy's initial ANDA to determine if it was "substantially

complete" when filed, one way that Ranbaxy could lose its exclusivity period.

JA0074-75; *see supra* pp.7-8.  Concurrently, FDA granted expedited review of their

generic Lipitor ANDAs, reasoning that if the agency determined that Ranbaxy's

ANDA was not "substantially complete," it would be in "the public interest to have

completed [the] scientific reviews of any atorvastatin ANDA that otherwise could be

14

approved and marketed to the American public as early as June 28, 2011." JA0084. Nevertheless, FDA did not provide approval for any of these ANDAs by June 28, 2011. JA0085. In July 2011, FDA concluded that Ranbaxy's initial ANDA was, in fact, substantially complete when filed, and thus it did not revoke Ranbaxy's exclusivity period. JA0074-76.

Separately, on December 7, 2010, Ranbaxy and Teva entered into an agreement under which Ranbaxy would either relinquish or selectively waive its 180-day exclusivity period if (i) FDA tentatively approved Teva's Lipitor ANDA by November 30, 2011 (or provided written confirmation by November 30, 2011, that Teva would be eligible for final approval but for Ranbaxy's exclusivity rights), and (ii) Teva manufactured certain quantities for commercial sale. JA0069-71. On February 3, 2011, Ranbaxy made FDA aware of this agreement, stating that "the agreement … provides that Ranbaxy is required to either relinquish its exclusivity or, if Ranbaxy's ANDA has been approved, to selectively waive its exclusivity in favor of Teva, provided that Teva's application is in position to obtain final FDA approval." JA0071.

Nevertheless, even though it would have led to an earlier launch of a generic Lipitor product, FDA did not provide tentative approval to Teva's generic Lipitor ANDA before November 30, 2011. JA0085. While reviewing Teva's ANDA, FDA issued a Warning Letter to Teva concerning significant regulatory violations.

JA0085-86.  FDA also concluded that Teva's ANDA contained data insufficiencies, and its proposed manufacturing facilities required multiple inspections.  *Id.* Consequently, FDA did not give tentative approval to Teva's ANDA until December 1, 2011.  JA0085.

## C.  Procedural History

Appellants are corporate consumers of brand and generic Lipitor, as well as serial filers of antitrust complaints.  Purporting to represent classes of direct purchasers, end payors, and opt-out retailers of brand and generic Lipitor, they filed suit against Pfizer and Ranbaxy alleging, *inter alia*, an anticompetitive scheme to delay the market entry of generic Lipitor, including by agreeing in the settlement agreement to an entry date of November 30, 2011.  They allege various violations of state and federal antitrust law.

The Judicial Panel on Multidistrict Litigation coordinated the cases and transferred them to the District of New Jersey.  The district court dismissed the complaints, but this Court held that Appellants had plausibly alleged antitrust violations.  *Lipitor*, 868 F.3d at 239, 246.

In 2022, the magistrate judge directed the parties to conduct targeted discovery and summary-judgment briefing on the threshold, dispositive question of antitrust standing—specifically, whether Ranbaxy or another generic ANDA filer would have obtained FDA approval for generic Lipitor before November 30, 2011.

*See* JA0021.  Appellants objected, but the district court affirmed, explaining that the magistrate judge did not abuse his "broad discretion to manage the[] docket and decide discovery issues" given his "significant knowledge" of the case and "the needs of the parties and judicial economy."  JA0029-30.

The parties engaged in discovery, and each side offered expert opinion on whether it was more likely than not that FDA would have approved Ranbaxy's amended ANDA earlier than November 30, 2011.  Appellants' expert, Kurt Karst, did not opine that FDA would have granted the AIP exception and started its review of Ranbaxy's ANDA any earlier than it did (*i.e.*, May 16, 2011).  He offered only the limited opinion that, after granting the AIP exception, FDA theoretically *could* have approved Ranbaxy's ANDA by November 29, 2011, one day before the entry date.  JA2734; JA2802.  Even then, Karst's only bases for that opinion were general statements concerning the importance of generic Lipitor, broad references to the agency's ability to mobilize resources for priority review, and Karst's belief that "as a general matter, where there's a will, there's a way at FDA."  JA2873.  Ranbaxy's expert, Daniel Troy, deemed Karst's opinion "speculative and unsupported" and opined that FDA could not have completed its review of Ranbaxy's ANDA "any faster than it did without sacrificing the quality or substance of its review," which in

Troy's experience "is something FDA would not do." JA2894-95. Ranbaxy moved for summary judgment on the antitrust-standing question, and Appellants opposed.[2]

On June 6, 2024, the district court granted summary judgment for Ranbaxy in an 83-page decision. JA0033-115. Citing *Wellbutrin*, the court explained that, to have antitrust standing, Appellants "must show that the harm they say they experienced—class-wide overcharges due to the delayed entry of a generic Lipitor— was caused by the delay in the entry date of that generic Lipitor equivalent." JA0034-35 (citing 868 F.3d at 164). As in *Wellbutrin*, "here, there was a regulatory requirement that actually precluded earlier entry of Ranbaxy's Lipitor ANDA," which "interrupted the causal link between the alleged injury and any damages complained-of." JA0104. Appellants "failed to create a genuine issue of material fact that it was more likely than not that FDA would have completed its review any sooner and approved Ranbaxy's generic drug manufacturer's ANDA earlier than November 30, 2011—even by one day." JA0036. Instead, the evidence showed that, at best, "FDA '*may* have been able' to approve" the ANDA on November 29, JA0114, but such "speculation" is insufficient, JA0103. Given "the fundamental inability of [Appellants] to show an integral element of their cause of action"—

---

[2] Ranbaxy and Pfizer together sought summary judgment. After summary-judgment briefing but before a decision, Pfizer settled with Appellants, leaving Ranbaxy as the sole defendant below and the sole appellee in this Court.

causation—Appellants lacked antitrust standing, and thus summary judgment for Ranbaxy was appropriate.  JA0034.

## SUMMARY OF ARGUMENT

**I.**  Appellants lack antitrust standing because they have failed to create a genuine issue of material fact that it is more likely than not that FDA would have approved Ranbaxy's Lipitor ANDA before November 30, 2011.

**A.**  *Wellbutrin* holds that to maintain an antitrust suit, a plaintiff must establish antitrust standing, which requires showing the causal connection between the antitrust violation and the harm to plaintiff.  When plaintiffs allege that a settlement delayed the launch of a generic drug, they must show that an earlier launch would have been legal, because a regulatory or legislative bar can break the causal chain. Specifically, plaintiffs must identify specific or concrete evidence demonstrating that it is more likely than not that an earlier launch would have been permissible.  Here, therefore, Appellants must produce specific or concrete evidence showing that it is more likely than not that FDA would have approved Ranbaxy's generic Lipitor ANDA before November 30, 2011, because federal law prohibited marketing generic Lipitor absent FDA approval.  Speculation that Ranbaxy may have been able to obtain earlier approval, or that it was theoretically possible for FDA to have provided earlier approval, does not defeat summary judgment.

**B.** Appellants fail to satisfy their burden on summary judgment. Appellants have not proffered any evidence, much less specific or concrete evidence, from which a reasonable jury could conclude that it is more likely than not that FDA would have granted an AIP exception before May 16, 2011, or started its thorough review of Ranbaxy's revised ANDA on May 16, 2011, but finished before November 30, 2011—the two scenarios by which Ranbaxy would have obtained earlier FDA approval.

First, there is no evidence that FDA would have made all of the determinations necessary to justify its extraordinary decision to grant an AIP exception before May 16, 2011. Appellants' own expert never opined otherwise, and Appellants appear to concede the issue. Appellants do cite an array of documents for the propositions that FDA was aware of the November 30, 2011, entry date and deemed it important to approve generic Lipitor given market demand and public health needs. But it is pure speculation to conclude from these unremarkable premises that it is more likely than not that FDA *would* have granted an earlier AIP exception, and the undisputed facts demonstrate precisely the opposite. Indeed, FDA refused to approve any generic Lipitor ANDA before November 30, including one submitted by Teva, whom Ranbaxy agreed could market generic Lipitor if FDA provided approval before November 30. FDA's failure to do so underscores the lack of evidence that FDA

20

would have taken any steps to get generic Lipitor on the market earlier than November 30, including granting an earlier AIP exception.

Second, there is no evidence from which a jury could conclude that FDA would have completed its "new full review" and approved Ranbaxy's substantially amended ANDA even faster than the six-and-a-half-month accelerated review that FDA undertook between May 16 and November 30, 2011. Appellants again argue that if Ranbaxy and Pfizer had agreed on an earlier date, FDA would have targeted that date and provided approval by that date given generic Lipitor's importance, but that is just more empty speculation that does not satisfy the summary-judgment standard. Appellants' expert conceded that target dates are merely aspirational; FDA frequently does not approve generic drugs in time for agreed-upon entry dates; and, here, even one day before the entry date, FDA still would not guarantee that it would provide approval by that date. While the evidence demonstrates that it is possible FDA could have approved Ranbaxy's ANDA by an earlier date, it is just as possible that it could not, which under *Wellbutrin* is insufficient to defeat summary judgment.

**C.** Having failed to satisfy their evidentiary burden, Appellants offer an array of irrelevant or incorrect arguments for reversal. Appellants cite a variety of antitrust principles drawn from over a half-century of case law, but they largely ignore the precedent that controls here—*Wellbutrin*, which they barely mention and tellingly, but unpersuasively, attempt to distinguish. Appellants next accuse the district court

of requiring them to show that FDA would have granted an AIP exception earlier, but the court did no such thing, and any error would be harmless besides given *de novo* review and Appellants' own argument in this Court. Appellants also invoke a battle of the experts; however, Ranbaxy never sought to exclude Appellants' expert, whose opinions (like Appellants' similar arguments) lacked a factual foundation sufficient to defeat summary judgment. Appellants contend that the district court failed to consider facts in its response to Ranbaxy's statement of undisputed facts, but Appellants improperly submitted an eight-page advocacy piece, and, regardless, the district court did not ignore the actual facts intertwined with Appellants' legal argument. Finally, Appellants argue that the district court impermissibly resolved disputed facts against them, yet Appellants' grievances almost entirely concern legal arguments, and any purported factual disputes are premised on misstatements of the record.

**II.** The district court did not abuse its substantial discretion in front-loading discovery and summary-judgment practice on the issue of whether FDA would have approved Ranbaxy's Lipitor ANDA earlier than November 30, 2011. That decision was a sensible use of resources given the dispositive nature of the antitrust-standing question in this complex, sprawling litigation. Appellants contend that bifurcation is disfavored, but their cited cases refer only to bifurcation at trial and actually support the commonsense proposition that limiting discovery and motion practice

may be appropriate when, as here, there is a potentially dispositive issue.  Appellants also argue that limited discovery deprived them of the opportunity to develop an expert economic model that would have estimated a "no-payment" entry date.  But even under such a model, Appellants would still have had to show that FDA would have approved Ranbaxy's generic Lipitor before November 30, 2011—specifically, by whatever earlier entry date the model established.  As demonstrated herein, Appellants have failed to do so, and a protracted period of full discovery—at enormous cost to the parties and courts—would not change that outcome.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*.  *DIRECTV Inc. v. Seijas*, 508 F.3d 123, 125 (3d Cir. 2007).  Summary judgment is appropriate if, "drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law."  *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015).

To survive summary judgment, the non-movant "must set forth specific facts showing that there is a genuine issue for trial."  *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014).  "Bare assertions, conclusory allegations, or suspicions will not suffice," *id.* at 269; likewise, "conjecture and speculation will not create a genuine issue of material fact," *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016).  And an "inference based upon a speculation or conjecture does

not create a material factual dispute." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

"[S]ummary judgment is not disfavored in the antitrust context." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010). To the contrary, "summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which may have a chilling effect on competitive market forces." *Id.* The "plaintiff in an antitrust case responding to a summary judgment motion must overcome a higher threshold, which is imposed in order to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." *Id.* (quotation marks omitted); *accord Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*, 841 F.App'x 399, 403 n.6 (3d Cir. 2021).

Finally, "matters of docket control and conduct of discovery are committed to the sound discretion of the district court." *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982). This Court "will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *In re Asbestos Prods. Liab. Litig.* (*No. VI*), 921 F.3d 98, 109 (3d Cir. 2019). "[E]specially during [a] massive litigation," or "a sprawling multidistrict matter," the "district judge must be given wide latitude with regard to case management." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 246-47 (3d Cir. 2013).

# ARGUMENT

I.  **Appellants Lack Antitrust Standing Because They Have Failed To Create A Genuine Issue Of Material Fact That It Was More Likely Than Not That FDA Would Have Approved Ranbaxy's ANDA Before November 30, 2011.**

A.  **Appellants Bear the Burden of Establishing Through Specific or Concrete Evidence, Not Speculation, That It Is More Likely Than Not That FDA Would Have Approved Ranbaxy's ANDA Before November 30, 2011.**

"In order to maintain an antitrust suit, a plaintiff must establish antitrust standing," which is "properly viewed as an element of an antitrust claim that can be resolved at summary judgment." *Wellbutrin*, 868 F.3d at 163-64.  To "establish antitrust standing," a plaintiff "must show that it has suffered an antitrust injury— that is, an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* at 164 (footnote and quotation marks omitted).  Plaintiffs bear the burden of showing the "causal connection between the antitrust violation and the harm to the plaintiff." *Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013); *see Wellbutrin*, 868 F.3d at 166 ("As the plaintiffs, the Appellants have the burden of proving that they have been injured."). [3]

Where, as here, plaintiffs allege that a settlement "delay[ed] the launch of generic versions" of a brand drug, plaintiffs "must show that the harm they say they

---

[3] "The state requirements for antitrust standing are functionally identical to the federal requirements." *Wellbutrin*, 868 F.3d at 163 n.53.

25

experienced … was caused by the settlement they are complaining about."
*Wellbutrin*, 868 F.3d at 142, 164-65.  In particular, plaintiffs cannot merely show that
a generic manufacturer "wanted to launch its drug"; plaintiffs "must also show that
the launch would have been legal."  *Id.* at 165.  That is because it is "beyond fair
dispute" that "a regulatory or legislative bar can break the chain of causation in an
antitrust case."  *Id.*; *see also In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791-
92 (8th Cir. 2006) (no antitrust injury where "[t]he absence of competition … is
caused by the federal statutory and regulatory scheme" prohibiting importation of
drugs, not "the alleged conduct of the defendants"); *RSA Media, Inc. v. AK Media
Grp., Inc.*, 260 F.3d 10, 15 (1st Cir. 2001) (no antitrust injury where plaintiff was
excluded from market by regulatory scheme); Phillip E. Areeda & Herbert
Hovenkamp, *Fundamentals of Antitrust Law* §3.04[B] (rev. 4th ed. Supp. 2015)
("[A] plaintiff cannot be injured in fact by private conduct excluding it from the
market when a statute prevents the plaintiff from entering the market in any event.").

Thus, for instance, in *Wellbutrin*, this Court addressed claims by direct and
indirect purchasers of Wellbutrin XL, a brand drug, that defendants violated federal
and state antitrust law by delaying the launch of generic drugs through reverse-
payment settlement agreements. 868 F.3d at 142.  Although plaintiffs alleged that,
absent the agreements, the generics would have launched earlier, the Court explained
that "[i]t is not enough for [plaintiffs] to show that [the generic manufacturer] wanted

to launch its drug; they must also show that the launch would have been legal" in light of "patent laws prohibiting the launch"—specifically, a patent that "prevented market entry" of generics absent a license. *Id.* at 165.

Plaintiffs therefore were required to "point to evidence affirmatively showing" that "it is more likely than not" that the generic manufacturer "*would* have obtained a license" under the patent. *Id.* at 166-67. Evidence showing that the manufacturer "*may* have been able to obtain a license" was insufficient, because "[a] plaintiff cannot satisfy the summary judgment burden based on speculation alone." *Id.* at 167. The Court held that plaintiffs had failed to identify "specific or concrete evidence" demonstrating that the manufacturer "would have obtained a license" and thus the earlier launch "would have been legal." *Id.* at 165-67. At most, the manufacturer had proffered evidence that it was "possible" it would have obtained a license; but such a "speculative" argument was inadequate to avoid summary judgment. *Id.* at 167.

The *Wellbutrin* plaintiffs also argued that an earlier launch "would have been legal" because the generic manufacturer "would have prevailed" in litigation challenging the branded manufacturer's patents that were keeping the generic drugs off the market. *Id.* at 165, 167. But the Court concluded that "[o]n this record … no reasonable jury could conclude that [the generic manufacturer] would have been more likely than not to prevail." *Id.* at 169. In sum, the *Wellbutrin* plaintiffs "fail[e]d

to show" that the generic manufacturer "would have been able to launch" its generic drug "without running afoul" of the preexisting legal barrier to entry. *Id.* Accordingly, the plaintiffs "failed to show that their injuries were caused by the overall settlement" and thus they did "not have antitrust standing," warranting summary judgment. *Id.* at 169-70.

Thus, to "withstand summary judgment" in this case, Appellants "must produce evidence from which a reasonable jury could conclude that it is more likely than not that" a generic Lipitor launch before November 30, 2011, "would have been legal." *Id.* at 165, 167. That obligation requires Appellants to identify "specific or concrete evidence" that "affirmatively show[s]" that "it is more likely than not" that a generic manufacturer "*would* have obtained" FDA approval sooner than November 30, because federal law prohibited marketing generic Lipitor absent FDA approval. *Id.* at 166-67. Because "[a] plaintiff cannot satisfy the summary judgment burden based on speculation alone," evidence showing that Ranbaxy theoretically "*may* have been able to obtain" FDA approval before November 30, 2011, or that it was theoretically "possible" for FDA to have approved Ranbaxy's Lipitor ANDA before November 30, 2011, does not meet that standard and does not defeat summary judgment for lack of antitrust standing. *Id.* at 167.

### B. Appellants Failed to Provide Specific or Concrete Evidence that Ranbaxy Would Have Obtained FDA Approval Before November 30, 2011.

Appellants failed to satisfy their evidentiary burden on causation and thus cannot establish antitrust standing, warranting summary judgment for Ranbaxy. Appellants allege that if Ranbaxy and Pfizer had agreed to an earlier entry date, FDA would have approved generic Lipitor before November 30, 2011, Ranbaxy and other generic competitors "would have begun selling" generic Lipitor "sooner than November 30, 2011," and Appellants would have paid less for brand and generic Lipitor. JA0283; *see also, e.g.*, JA2734. But Appellants do not (and cannot) dispute that generic drugs cannot be legally marketed absent FDA approval, which constitutes "a regulatory or legislative bar" that "can break the chain of causation in an antitrust case." *Wellbutrin*, 868 F.3d at 165. Therefore, like the *Wellbutrin* plaintiffs, who alleged economic injuries from a purportedly improper agreement to delay entry of cheaper generic drugs—notwithstanding a preexisting legal barrier to earlier entry—Appellants' theory requires them to identify "specific or concrete evidence," and not just offer "speculation," that "it is more likely than not" that Ranbaxy or another generic manufacturer "*would* have obtained" FDA approval before November 30, 2011, thus removing that legal barrier and allowing the sale of generic Lipitor. *Id.* at 167.

Appellants have failed to make this showing. There are only two possible scenarios under which Ranbaxy would have obtained FDA approval before November 30, 2011: (1) if FDA had granted an AIP exception before May 16, 2011, and reviewed and approved Ranbaxy's amended ANDA on the exact same timeline it actually employed, or (2) if FDA completed the "new full review" of Ranbaxy's amended ANDA that it commenced on May 16, 2011, on an even more expedited schedule than it actually employed in the real world. Appellants have not proffered any evidence, much less "specific or concrete evidence," from which a reasonable jury could conclude that it is more likely than not that FDA would have granted an AIP exception before May 16, 2011, or started its thorough review of Ranbaxy's revised ANDA on May 16, 2011 but finished before November 30, 2011.

**1.    Appellants Have Failed to Provide Specific or Concrete Evidence That FDA Would Have Granted an AIP Exception Before May 16, 2011.**

There is no evidence creating a genuine factual issue that FDA would have granted an AIP exception—thereby allowing it to commence its substantive review of Ranbaxy's revised ANDA—earlier than May 16, 2011. Appellants' expert, Karst, tellingly refused to address that issue, much less opine that FDA would have granted an AIP exception earlier than May 16, 2011. *See* JA2870 (testifying that "I have not yet been asked to perform an evaluation of how much earlier or how early any substantive review of the application may have occurred"). By contrast, Ranbaxy's

expert Troy stated, and Karst never disputed, that "there is no basis to conclude that FDA would have begun a substantive review of Ranbaxy's ANDA for generic Lipitor earlier than it did."  JA2896.

Before this Court, Appellants appear to concede this issue.  They contend that the "only issue" at summary judgment is "whether a jury could find that FDA would have been able to shave off one day from" the period "between May 11, 2011, when FDA documented its grant of an exception to the AIP, and FDA's approval of Ranbaxy's ANDA on November 30."  Br.33.  By Appellants' own admission, therefore, the "only" basis for reversal is that there is evidence that FDA would have granted ANDA approval before November 30, after starting its substantive review from the May 2011 date on which it granted the AIP exception—*not* that there is evidence FDA would have granted the AIP exception (and started its substantive review) any earlier than that date.[4]

Despite this concession, and notwithstanding their own expert's refusal to address the question, Appellants nevertheless contend later in their brief that there is

---

[4] Appellants repeatedly refer to "May 11" as the date when "FDA documented its decision to grant the [AIP] exception."  Br.25; *see also id.* at 11, 33, 43.  But May 11 was only the date of an FDA memorandum "proposing" that the AIP exception be granted and giving reasons for such a determination.  JA1046.  FDA made its decision subsequently, and it communicated to Ranbaxy its decision to "review your firm's ANDA" under an "AIP Exception" on May 16.  JA1039-40.  In any event, Appellants' argument does not turn on whether the date is May 11 or 16.

evidence "that FDA would have granted the AIP exception earlier." Br.46. Specifically, Appellants cite (1) other generic manufacturers' requests to revoke Ranbaxy's exclusivity period; (2) FDA correspondence regarding those requests; (3) FDA's memorandum granting the AIP exception; (4) a "Label Approval Summary" during review of Ranbaxy's ANDA; and (5) FDA correspondence regarding approval of Ranbaxy's ANDA. Br.47-52. Appellants invoke these documents to assert that FDA "was aware of" the November 30, 2011 agreed entry date and "considered the availability of generic Lipitor as a public health issue," especially given the "size of the market demand for this drug product," *id.* at 47, 48, 50 (quotation marks omitted). From those premises, Appellants argue that "[h]ad that [agreed] date been earlier" than November 30, 2011, "it is likely that FDA would have also granted an earlier exception to its AIP if necessary to get generic Lipitor on the market by that earlier date." *Id.* at 52; *see also id.* at 47 ("Had that agreed date been earlier, it is likely that FDA's … grant of the AIP exception, also would have been earlier.").

But while it is undisputed that FDA was aware of the November 30, 2011 entry date and of the importance of getting generic Lipitor to market, it is "pure speculation" to conclude from those unremarkable premises that it is "more likely than not" that FDA "would have" granted an AIP exception sooner than May 16, 2011. *Wellbutrin*, 868 F.3d at 167 & n.57. If anything, the undisputed facts

demonstrate precisely the opposite. Granting an AIP exception is extremely rare, and FDA repeatedly told Ranbaxy that it would not review its Lipitor ANDA until Ranbaxy provided FDA "significant assurance" that it had comprehensively resolved its data integrity issues, which continued to plague Ranbaxy after the AIP was imposed. *See supra* pp.10-11; *see also* JA2699-705. Indeed, for over a year before May 2011, Ranbaxy had been petitioning FDA for an AIP exception, but FDA had consistently rejected Ranbaxy's overtures. *See* JA2703-05. It was only after other generic manufacturers sought to revoke Ranbaxy's first-filer exclusivity in 2011 that FDA officials began to address the possibility of an AIP exception. JA5305-06; JA2711-16.

In the face of those uncontested facts, Appellants fail to offer even a suggestion, much less "specific or concrete evidence," *Wellbutrin*, 868 F.3d at 167, as to how FDA would have obtained any earlier the "significant assurance" it demanded from Ranbaxy to resolve the AIP, or taken the extraordinarily unusual step of granting an AIP exception any earlier. Although "possible" that FDA could have granted an earlier exception, the notion that FDA "would have" done so simply because it was aware of the market entry date and the importance of generic Lipitor, *id.*, is an "inference based upon a speculation or conjecture," which "does not create a material factual dispute," *Robertson*, 914 F.2d at 382 n.12.

FDA's treatment of Teva's Lipitor ANDA illustrates the speculative nature of Appellants' argument. As noted, FDA was aware that Teva and Ranbaxy agreed that Teva could launch generic Lipitor *before* Ranbaxy—as early as June 28, 2011—if Teva obtained tentative FDA approval of its ANDA (or written confirmation that it would be eligible for final approval) by November 30, 2011. *See supra* pp.15-16. FDA even granted "expedited review status" to Teva's ANDA, "in order to have a generic product in the marketplace as soon as possible." JA2116. Nevertheless, FDA did not grant approval of Teva's ANDA until December 1—*one day too late*. And while Appellants emphasize that FDA granted expedited review of not just Teva's but other generic manufacturers' Lipitor ANDAs, Br.48-50, Appellants ignore that FDA did not approve *any* of those ANDAs by the target date of June 28, 2011. *See* JA0084-85.

FDA's refusal to approve Teva's Lipitor ANDA (or any other generic manufacturer's Lipitor ANDA) before November 30 underscores the lack of evidence that FDA "would have" taken any steps to get generic Lipitor on the market earlier than November 30—including granting the AIP exception before May 16, 2011. Appellants' own expert refused to opine that FDA would have granted an earlier AIP exception. Any suggestion to the contrary is "pure speculation" that does not defeat summary judgment. *Wellbutrin*, 868 F.3d at 167 n.57.

### 2. Appellants Have Failed to Provide Specific or Concrete Evidence That It Is More Likely Than Not That FDA Would Have Approved Ranbaxy's ANDA Before November 30, 2011.

Because there is no evidence that FDA would have granted an AIP exception before May 16, 2011, Appellants must prove that FDA would have reviewed and approved Ranbaxy's substantially amended ANDA in fewer than the six-and-a-half months FDA took between May 16, 2011 and November 30, 2011—at a time when the median time from ANDA receipt to approval exceeded *two years*. But Appellants cannot "affirmatively show[]" it is "more likely than not" that Ranbaxy "*would* have obtained" FDA approval before November 30, 2011. *Wellbutrin*, 868 F.3d at 166-67. Instead, Appellants again rely on "speculation," at most demonstrating that FDA "*may* have" been able to grant earlier approval, or that it was "possible" for FDA to do so—none of which "satisf[ies] the summary judgment burden." *Id.* at 167.

As with their AIP exception argument, Appellants emphasize FDA's awareness of the November 30 entry date and the importance of getting generic Lipitor to market, both of which "were front and center in FDA's management of the approval process." Br.37-38. From that, Appellants contend that "had Pfizer and Ranbaxy agreed to an earlier entry date"—even one day earlier—"FDA would have also successfully targeted that earlier date" and therefore "likely would have succeeded in completing its review of Ranbaxy's ANDA by that date." *Id.* at 31, 37; *see also id.* at 41-42 (maintaining that "FDA would have marshalled the resources

necessary to complete review of Ranbaxy's ANDA by the earlier date, and likely would have succeeded"). Appellants also cite the opinion of their expert, Karst, that had there been an earlier entry date, "FDA's practice would have been to target approval" of Ranbaxy's ANDA "by that date," and thus "FDA approval of the ANDA no later than that date would have been highly likely." Br.40-41 (emphasis omitted).

But again, while FDA was undoubtedly aware of the November 30 entry date and generic Lipitor's significance, it is sheer speculation to conclude from those unremarkable premises that FDA would have completed its already extraordinarily expedited review of Ranbaxy's substantially amended ANDA (including two "major amendments," plus numerous other amendments)—in what FDA called a "new full review"—earlier than November 30. As Karst himself conceded, even obtaining FDA's approval by November 30 was "aspirational" because "there's no guarantee"; "FDA's not going to cut corners and approve a product that they haven't determined is safe and effective." JA2879-80.

Karst's concession is correct and underscores Appellants' speculation. Evidence that FDA *aims* to approve ANDAs by a "targeted" entry date is not "specific or concrete" evidence that FDA would have met that goal. And although FDA may endeavor to approve generic drugs on a schedule that allows the earliest possible entry date, its first priority is to ensure that generic drugs are safe and effective. Thus on multiple occasions, FDA has failed to approve generic versions

36

of blockbuster, high-demand products by their licensed entry dates.  *See supra* pp.14-15.  And FDA failed to accelerate its review process to permit an earlier launch of Teva's generic Lipitor.  *See supra* pp.15-16.  That FDA has failed to meet agreed-upon entry dates for other therapeutically significant products—including Teva's generic Lipitor—reinforces that there is no competent evidentiary basis for concluding that FDA would have further accelerated its already-expedited review of Ranbaxy's Lipitor ANDA and provided approval earlier than November 30.

Further undermining Appellants' speculative argument that FDA approval before November 30 would have been "highly likely," the evidence shows that FDA faced an enormous task in approving Ranbaxy's Lipitor ANDA even by November 30, engaged in an extraordinary amount of activity during the review process to try to meet that date, and still only barely managed to do so.  Ranbaxy's major amendments to its ANDA meant that FDA was not simply resuming its review but undertaking a "new full review" of the substantially revised ANDA.  *See* JA2739 (Karst admitting that "[a]n ANDA applicant's submission of a major amendment … results in reviewers having to refamiliarize themselves with the application").  For good reason, then, FDA made clear when it granted the AIP exception and commenced review that "[p]rompt review of [Ranbaxy's] ANDA does not, of course, guarantee that the application will be ready for final approval by November 30, 2011."  JA2717.

Thereafter, far from dallying in a manner that leaves open the possibility of an even more expedited review process to meet an earlier date, FDA worked with remarkable speed, yet it only just managed to approve Ranbaxy's ANDA on November 30—and even on November 29, it still could not promise approval the next day. In June 2011, Ranbaxy submitted four additional amendments to its ANDA. JA2718-19. On June 14, FDA notified Ranbaxy of several deficiencies and requested all available long-term stability data. *Id.* On June 20, FDA requested a Bioequivalence Amendment, which Ranbaxy submitted on July 18. *Id.* Ranbaxy responded to the June 14 deficiencies and the request for data with two amendments on July 27 and September 1. *Id.* On July 28, Ranbaxy submitted another amendment, and on July 29, FDA completed its labeling review. *Id.*[5]

FDA did not slow down in August 2011. On August 16, FDA notified Ranbaxy of bioequivalence deficiencies and requested that Ranbaxy repeat dissolution testing. JA2719. On August 26, Ranbaxy responded with a new Bioequivalence Amendment. *Id.* In September, FDA ordered an inspection of Ranbaxy's Ohm facility, which occurred between September 28 and October 3, 2011. JA2720. Meanwhile, on October 3, FDA followed up on Ranbaxy's July 27

---

[5] In the meantime, FDA was also reviewing whether Ranbaxy's ANDA was "substantially complete" when first filed in 2002, which it determined on July 29. JA2714-15. *See supra* pp.14-15.

and September 1 amendments with a request for a telephone amendment, and Ranbaxy complied on October 5. *Id.* On October 21, FDA completed its chemistry review. *Id.* And on October 25, FDA completed its bioequivalence review and found the inspection of the Ohm facility to be acceptable. *Id.*

At that point, the last hurdle before approval was FDA's on-site inspection of the Toansa, India facility. FDA inspected the Toansa facility between November 21 and 25, but it found objectionable conditions that required further discussion. *Id.* During a November 29 telephone call, FDA acknowledged that Ranbaxy hoped to launch its generic Lipitor on November 30, but it indicated that "it did not appear that resolution of the Toansa inspection results could be reached by tomorrow because multiple parties are involved," and it refused to guarantee approval the next day. JA2722. Following the November 29 call, Ranbaxy responded to FDA's observations from the inspection. *Id.* Finally, on November 30, FDA granted the facility an "overall recommendation of acceptable" and approved Ranbaxy's ANDA. JA2721; JA1172.

All in, FDA took approximately six-and-a-half months to complete its expedited, "new full review" of Ranbaxy's amended ANDA, at a time when the median review period exceeded two years—and it still barely finished on November 30, 2011, having made no guarantees as early as the day before that it could do so. By any measure—and particularly by the standards of federal agencies—FDA's

review and approval were undertaken with exceptional speed. There is no concrete evidence that FDA nevertheless could have, much less *would have*, completed its review any earlier, even by November 29. Any suggestion otherwise is mere conjecture. At most, it is "certainly possible" that FDA would have done so, but it is "also certainly possible" that it would not, *Wellbutrin*, 868 F.3d at 167—just as it has not in other instances involving other blockbuster drugs. "Without more specific or concrete evidence" that FDA would have granted earlier approval, summary judgment is appropriate. *Id.* Accordingly, the district court's decision granting summary judgment should be affirmed.

### C. Appellants' Remaining Arguments Lack Merit.

Rather than make any serious effort at identifying "specific or concrete" evidence from which a jury could conclude that it is more likely than not that FDA would have approved Ranbaxy's ANDA before November 30, 2011, Appellants devote most of their brief to an array of irrelevant or incorrect arguments. None supports reversal.

**1.** Appellants first cite a litany of cases to argue that "causation is particularly ill-suited for summary judgment," and they offer a grab-bag of propositions from various courts over the past eighty years. Br.28-31 (capitalization altered). But critically, Appellants largely disregard the precedent that controls here: *Wellbutrin*. There, as noted, this Court held that "a regulatory or legislative bar can break the

chain of causation in an antitrust case," and it determined that the plaintiffs had failed to create a material factual issue that a generic manufacturer would have been able to launch its drug in light of a regulatory bar—specifically, "federal patent law," which blocked the generic's market entry. *Wellbutrin,* 868 F.3d at 165-66. The Court thus concluded that plaintiffs lacked antitrust standing and affirmed summary judgment. *Id.* at 169-70.

*Wellbutrin* is controlling authority here and likewise compels summary judgment for Ranbaxy. Tellingly, Appellants sweep *Wellbutrin* under the rug. They only briefly mention it and unpersuasively attempt to distinguish it—a sure sign that they cannot satisfy its principles. *See* Br.29, 38-39. Appellants chiefly contend that *Wellbutrin* is inapplicable because the patent in that case "was an independent legal bar that broke any chain of causation." *Id.* at 39; *see also id.* at 28 (asserting that the patent in *Wellbutrin* "is an example of … an intervening cause" that "break[s] the causal connection"). By contrast, they argue, "FDA approval of Ranbaxy's ANDA was not an independent bar that broke the chain of causation." *Id.* at 39.

Appellants misrepresent the relevant analysis. Here, the "regulatory or legislative bar" that "break[s] the chain of causation," *Wellbutrin*, 868 F.3d at 165, is federal law that prohibits marketing a drug absent FDA approval. That federal law prohibited Ranbaxy from selling generic Lipitor unless FDA granted approval of Ranbaxy's Lipitor ANDA—just as "federal patent law" prohibited the generic

manufacturer in *Wellbutrin* from selling its drug unless it secured a license or prevailed in patent litigation. *Id.* at 165-66. The inquiry, then, is whether FDA would have granted approval of Ranbaxy's Lipitor ANDA earlier than the agreed-upon date—for, without such approval, generic Lipitor could not have been marketed and Appellants could not have suffered injury because of the agreed-upon entry date established by the Pfizer-Ranbaxy settlement. *See, e.g.*, *In re Mallinckrodt PLC*, 2022 WL 16551333, at *2 (D. Del. Oct. 31, 2022) (rejecting argument "that *Wellbutrin* is distinguishable because the alleged obstacle to competition independent of a defendant's conduct was patent law, rather than FDA regulation").[6]

Appellants also claim that "unlike *Wellbutrin*," they "are not proposing a counter-factual scenario." Br.39. This assertion is puzzling, because that is exactly what Appellants are proposing: a counter-factual world in which FDA granted approval of Ranbaxy's Lipitor ANDA before November 30, 2011, just like the *Wellbutrin* plaintiffs proposed a counter-factual world in which the generic manufacturer obtained a license or prevailed in patent litigation. In both cases, the

---

[6] Appellants contend that *In re Zetia (Ezetimibe) Antitrust Litigation*, 655 F.Supp.3d 406 (E.D. Va. 2023), "distinguish[ed]" *Wellbutrin* "on the grounds that the patent holder was not a party to the reverse payment." Br.39. But *Zetia* (an out-of-Circuit district court decision) was addressing an entirely different circumstance—an "alternate settlement theory" of causation, 655 F.Supp.3d at 432—that was addressed (and rejected) by the *Wellbutrin* district court and was not at issue in this Court's *Wellbutrin* decision.

inquiry is whether the plaintiffs proffered sufficient evidence that this counterfactual world *would* have actually taken place absent the agreed-upon generic entry date. And in both cases, the plaintiffs have not carried their burden at summary judgment.

Finally, Appellants note that "lower courts have held that FDA approval does not break the causal chain where the antitrust violation delayed the regulatory approval process." Br.39-40. But again, what "break[s] the causal chain" here is not "FDA approval" but federal law prohibiting the marketing of generic drugs *absent* FDA approval. *See In re Canadian Imp.*, 470 F.3d at 790-91 (explaining that plaintiffs' injury from higher drug prices "is caused by the federal statutory and regulatory scheme" barring importation of drugs from Canada). Regardless, Appellants' cases are non-controlling and distinguishable.[7]

---

[7] For example, Appellants' first two cases were on motions to dismiss, which both courts cited as a reason not to grapple with the antitrust-injury question. *See Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, 2022 WL 952896, at *7 n.48 (E.D. Pa. Mar. 30, 2022); *Takeda Pharm. Co. v. Zydus Pharms. (USA) Inc.*, 358 F.Supp.3d 389, 398 (D.N.J. 2018). Appellants' third case, *In re Flonase Antitrust Litigation*, 798 F.Supp.2d 619 (E.D. Pa. 2011), predates *Wellbutrin*. Appellants' last case, *In re Zetia (Ezetimibe) Antitrust Litigation*, 2022 WL 4355149 (E.D. Va. Sept. 2, 2022), *refutes* Appellants' argument. There, the magistrate judge recommended summary judgment denial because, in his view, there was sufficient evidence that the generic manufacturers would have "obtained regulatory approval to enter the market earlier." *Id.* at *24. The magistrate judge thus *accepted* the proposition that absence of FDA approval breaks the causation chain. He recommended summary judgment denial only because plaintiffs (unlike Appellants here) had sufficiently shown that FDA would have granted approval.

**2.** Appellants also argue that the district court held that they "*had* to show that FDA would have granted the AIP exception earlier."  Br.32 (emphasis added); *see also id.* (contending that district court concluded Appellants "need[ed] to prove" that FDA would have granted AIP exception earlier); *id.* at 33 (referring to "[t]he district court's requirement that [Appellants] … guarantee that FDA would have granted the AIP exception earlier").  The district court in fact imposed no such requirement.

Appellants' argument is based on two snippets from the district court's lengthy opinion:  first, that "absent the AIP exception, any FDA review of Ranbaxy's Lipitor ANDA would have been impossible"; and, second, that approval of Ranbaxy's Lipitor ANDA "was wholly predicated upon the AIP exception being granted."  *Id.* at 32 (quoting JA0091, JA0109).  But both of these statements are true, and uncontroversial:  FDA could not, and would not, perform a substantive review of Ranbaxy's Lipitor ANDA unless it granted an AIP exception.  Appellants do not, and could not, contend otherwise.

Nothing in those two statements suggests that Appellants *had* to show that FDA would have granted the AIP exception earlier in order for them to defeat summary judgment.  Nor did the district court so suggest or hold (nor, for that matter, has Ranbaxy so argued).  To the contrary, the district court recognized that "whether FDA would have approved Ranbaxy's Lipitor ANDA [before] November 30, 2011" required examining two "sub-questions":  "whether FDA would have granted an AIP

44

exception before May 16, 2011," and "whether Ranbaxy would have obtained final FDA approval earlier than November 30, 2011." JA0090. The court concluded that "there is no genuine issue of material fact as to these two sub-questions," indicating that it recognized that Appellants could defeat summary judgment if they established a genuine factual issue on *either* of these questions. *Id.* At no point did the court say that Appellants *had* to establish a genuine factual issue on the first question, regarding the AIP exception.

Regardless, any error would be harmless in light of this Court's *de novo* review and Appellants' own argument in this Court. As noted, Appellants contend that "[t]he only issue" that should be considered by this Court is "whether a jury could find that FDA would have been able to shave off one day from" the period between the May 16 granting of the AIP exception and the November 30 entry date—an argument that assumes that the AIP exception date did not "move at all" from May 16. Br.33. But as explained above, there is no competent evidence that it is more likely than not that FDA would have granted approval in fewer than the six-and-a-half months FDA took between May 16 and November 30—only Appellants' speculation. *See supra* pp.35-40. Accordingly, even accepting Appellants' argument that the "only issue" is whether FDA would have approved Ranbaxy's Lipitor ANDA before November 30 on an even more expedited timetable that began on May 16, summary judgment remains appropriate.

**3.** Appellants briefly refer to a "battle of experts" and argue that courts "routinely" let experts opine on "whether and when FDA would grant earlier approval to ANDAs absent the alleged anticompetitive behavior." Br.41-42. But all of Appellants' cases involved motions to exclude experts, and Ranbaxy has not sought to exclude Karst. Regardless, "[e]xpert testimony without … a factual foundation cannot defeat a motion for summary judgment." *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1198 (3d Cir. 1995). With or without an expert, a plaintiff must "present *facts*" satisfying its evidentiary burden. *Id.* at 1199. Ultimately, it makes no difference that Appellants chose to funnel their evidence through an expert. Karst's opinions are no less speculative and no more sufficient than are Appellants' arguments—which is hardly surprising given that they are all based on the same evidence that fails to create a genuine factual issue.

**4.** Appellants contend that the district court erroneously failed to consider "specific facts" that they proffered in response to a paragraph in Ranbaxy's statement of undisputed facts. Br.34-36. But Appellants again misstate the district court's opinion, and there is no error, much less reversible error.

The district court faulted Appellants for responding to Ranbaxy's Paragraph 33 with "a long recitation" that was "rife with both legal arguments and conclusions." JA0045. As even a cursory glance at Appellants' Paragraph 33 confirms, that characterization is correct. Appellants' response to Ranbaxy's

statement of undisputed facts mostly consists of concise, single-paragraph responses to each asserted fact.  Appellants' response to Paragraph 33, however, is a nearly *eight-page* submission that is essentially a motion.  JA5182-5190.  As the district court correctly observed, the response is replete with legal arguments addressing issues at the center of the summary judgment proceedings (often mirroring Appellants' legal arguments in this Court).  *See, e.g.*, JA5186 ("Had Ranbaxy agreed to an earlier entry date with Pfizer, FDA would have targeted an earlier date to complete review of Ranbaxy's Lipitor ANDA."); JA5187 ("Had Pfizer and Ranbaxy agreed to an earlier entry date for generic Lipitor, FDA would have targeted that earlier date (just as it targeted the date that they actually negotiated) and would have approved Ranbaxy's ANDA earlier than November 30, 2011.").  The district court was entitled to, and properly did, conclude that such advocacy violated local rules. *See* D.N.J. Local Rule 56.1(a) (summary judgment opponent's "responsive statement of material facts … *shall not contain legal argument or conclusions of law*" (emphasis added)).

At the same time, the district court did not simply "fail[] to consider" the actual facts in Appellants' Paragraph 33 response.  *Contra* Br.35.  Those facts, which concerned FDA's activity and correspondence (in Appellants' words, "the FDA regulatory timeline," Br.36), were essentially undisputed and ultimately made their

ated header

way into the district court's lengthy opinion.[8]  The problem for Appellants is that, even assuming those facts—and other facts "demonstrating that FDA was aware of the November 30, 2011 negotiated entry date, specifically targeted it for approval of Ranbaxy's ANDA, and viewed the failure to approve a generic version of the largest blockbuster brand drug ever by the earliest permitted entry date as a significant public health issue," *id.* at 34—Appellants still have not created a genuine factual dispute that it is more likely than not that FDA would have granted Ranbaxy's Lipitor ANDA before November 30, 2011.  *See supra* pp.30-40.  Accordingly, even if there were any error in the court's treatment of Appellants' Paragraph 33 response (though there was not), it would not warrant reversal.

**5.**    Finally, Appellants argue that the district court "improperly resolved disputed facts against" them.  Br.42 (capitalization altered); *id.* at 42-46.  But the

---

[8]  *Compare, e.g.*, JA5183 (Appellants asserting "FDA was aware of Ranbaxy's agreed-upon entry date by no later than August 18, 2009, when Ranbaxy informed FDA at a meeting that it planned to launch generic Lipitor on November 30, 2011"), *with* JA65 (district court noting that "[d]uring [an] August 18, 2009 meeting with FDA … Ranbaxy told FDA that its planned launch date for generic Lipitor was November 30, 2011); *compare also* JA5187 (Appellants asserting "FDA told Ranbaxy it was targeting November 30, 2011 to complete the review of Ranbaxy's Lipitor ANDA"), *with* JA108 (district court reciting Ranbaxy call note that FDA was "targeting the Nov 30th date" and "working towards the Nov 30th date").  Indeed, further confirming that these facts were undisputed, Appellants' citations were largely exhibits to *Ranbaxy's* motion for summary judgment.  *See* JA5183, JA5187.

supposed "factual disputes" that Appellants identify almost entirely concern legal arguments and Appellants' disagreements with the district court's legal conclusions.

For example, Appellants contend that the district court "rejected the inference that FDA likely would have targeted any agreed entry date and likely would have met any such earlier date." Br.42. But the assertion that "FDA likely would have targeted any agreed entry date and likely would have met any such earlier date" is argument—indeed, it permeates Appellants' brief in this Court. *See, e.g.*, *id.* at 37. It is no different from the *Wellbutrin* plaintiffs' argument that the manufacturers there "would have entered into a license agreement" permitting sale of the generic drug despite the existing patent bar, or plaintiffs' argument that the generic manufacturer "would have prevailed in [its] infringement suit." 868 F.3d at 167 & n.57. This Court did not consider those to be "inferences" that had to be resolved in plaintiffs' favor given the summary-judgment posture. Instead, plaintiffs had to provide "specific or concrete evidence," not just "speculation," that these events "would have" occurred, and because they did not, summary judgment was appropriate. *Id.* at 167. So too here.

Similarly, Appellants assert that the district court "rejected any inference that FDA would have worked to approve generic Lipitor by an earlier date because it claimed that the AIP Exception Memo shows that Ranbaxy's Lipitor ANDA approval 'was always conditional upon an AIP exception or complete removal of the

AIP' and there was 'no substantive showing that the November 30, 2011 date had any bearing upon the AIP period and the exception Ranbaxy was eventually granted.'" Br.43 (quoting JA0109). Appellants deem this conclusion "logically and factually flawed." *Id.* But their "logical" argument is—as that description suggests—merely a disagreement with the court's legal reasoning. *Id.* When Appellants finally get to their "factual" argument, they contend that "the district court's conclusion that the grant of the AIP exception was separate from the agreed-upon November 30, 2011 date is wrong" because FDA and other generic Lipitor manufacturers were "aware of that date." *Id.* But this is again taking issue with the court's legal conclusion—more precisely, its determination that a change in the market entry date would not have altered the date on which FDA granted the AIP exception. Appellants may (and do) disagree with that determination, but that is a legal argument, not a factual dispute.

Appellants' other examples follow suit. Appellants contend that one of the district court's conclusions was "contrary to the law," Br.44, which is self-evidently not an assertion that the court improperly resolved a factual dispute. Similarly, Appellants assert that the district court determined that "it is impossible to conclude with certainty what FDA would have done" if an earlier entry date had been negotiated, and they argue that they "need not prove causation with 'certainty.'" Br.44-45. For one, the district court never said that "it is impossible to conclude

with certainty what FDA would have done" and never held Appellants to that standard. For another, the contention that Appellants "need not prove causation with 'certainty'" is still more legal argument, not a dispute over facts.

Appellants likewise state that the district court "conclud[ed] from FDA's failure to approve ANDAs for other blockbuster drugs by the earliest possible launch date that there was no evidence that FDA would have approved Ranbaxy's ANDA even one day earlier than November 30." Br.45 (citation omitted). FDA's failure to approve other generic Lipitor ANDAs was not the only basis for the district court's conclusion, however; rather, it "additionally supported" the court's conclusion. JA0113-14. Regardless, Appellants' criticisms of this reasoning—that the record does not say "why FDA did not grant approval" and "the other ANDAs are not good benchmarks," *id.*—are still more legal argument, not assertions that create a material factual dispute precluding summary judgment.

Appellants last contend that FDA's failure to approve Teva's Lipitor ANDA by November 30 "did not justify" the district court's conclusion because Teva was barred from launching given Ranbaxy's exclusivity period. But once again, this is legal argument, not an example of a material factual dispute. Regardless, Appellants' argument is misguided. The Teva-Ranbaxy agreement provided that Ranbaxy would *waive* its exclusivity period if FDA provided tentative approval to Teva's Lipitor ANDA. FDA thus knew that it could get a generic Lipitor drug to market earlier

than November 30; all it had to do was review and approve Teva's ANDA, which did not suffer from any of Ranbaxy's data-integrity issues. Nevertheless—and notwithstanding the acknowledged importance of getting generic Lipitor to the market marshaling all of FDA's resources—FDA failed to provide approval before November 30. *See supra* pp.15-16. As the district court correctly observed, the Teva example—like other examples of generic drugs that FDA does not approve by an agreed-upon entry date, *see supra* pp.14-15—demonstrates that "FDA does not alter its regulatory review processes merely because there is an earlier entry date allowed for these manufacturers," JA0099, in turn reinforcing that summary judgment for Ranbaxy is warranted.

## II. The District Court Did Not Abuse Its Discretion In Limiting Discovery and Summary-Judgment Practice To The Dispositive Issue Of Antitrust Standing.

Appellants also contend that the district court erred in granting "bifurcated discovery." Br.53-55. But the court's decision to front-load discovery and summary-judgment practice on a single, dispositive issue—whether, consistent with *Wellbutrin*, Appellants had antitrust standing because it was more likely than not that FDA would have approved Ranbaxy's generic Lipitor earlier than November 30, 2011—was a sensible use of resources and not erroneous, much less an abuse of discretion.

Appellants begin by citing *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98 (3d Cir. 1992), for the proposition that "[b]ifurcation at trial is disfavored." Br.53. *Barr* is doubly inapposite. First, bifurcation *at trial* did not occur here. Second, *Barr*—which *upheld* trial bifurcation—merely reiterated this Court's view that categorical bifurcation of *all* negligence trials, as opposed to case-by-case determination, is inappropriate. *See* 978 F.2d at 115. The cases cited by Appellants denying bifurcated discovery, *see* Br.53, reflect that case-by-case approach. Yet those decisions—and Appellants—acknowledge the commonsense proposition that limiting discovery and motion practice "may be appropriate" where there is a "narrow, potentially dispositive issue." *MacLean v. Wipro Ltd.*, 2023 WL 3742832, at *3 (D.N.J. May 31, 2023).

That is exactly what occurred here. Reflecting the fact that a holding in Ranbaxy's favor would defeat antitrust standing and end this litigation, the district court limited discovery and summary-judgment practice to that targeted, dispositive issue. The district court's decision lies well within the "wide latitude" that it enjoys "with regard to case management," particularly, as here, "during [a] massive litigation" or "a sprawling multidistrict matter." *In re Asbestos Prods.*, 718 F.3d at 246-47.

Appellants complain that this case "illustrates the dangers of bifurcation" because over thirteen years have passed since its commencement and "the only

substantive issue" on which discovery has occurred is "the narrow issue of FDA approval." Br.53-54.  As an initial matter, this litigation's lengthy nature is due to many factors, including its complexity, Appellants' previous appeal (and this Court's remand), mediation efforts, and the COVID-19 pandemic.   And Appellants' insinuation of meager discovery misstates the record:  Appellants have received over *1.5 million* documents.   Regardless, these considerations are irrelevant to the pertinent inquiry, which is whether the district court acted within its substantial discretion to front-load discovery on the dispositive question of whether FDA would have granted approval of Ranbaxy's Lipitor ANDA before November 30, 2011. Because a decision in Ranbaxy's favor on that question would end this litigation, it made eminent sense to have targeted discovery and motion practice on that narrow, dispositive issue, rather than to force the parties (and the court) to expend extraordinary resources on years-long "full discovery," Br.54, followed by omnibus summary-judgment practice.

Nor have Appellants demonstrated the necessary "actual and substantial prejudice" to warrant this Court's interference with the district court's "control of its docket." *In re Asbestos Prods.*, 921 F.3d at 109.  Appellants claim prejudice because "the FDA approval issue was not 'totally distinct'" but instead "intertwined with the merits." Br.54.  This argument fails twice over.  First, Appellants' cited cases reflect

that "totally distinct" means "totally distinct *from class issues*," *MacLean*, 2023 WL 3742832, at *3 (emphasis added), a phrase Appellants conspicuously omit.

Second, Appellants contend that if they had "been permitted full discovery, they would have provided an expert economic model that estimated a 'no-payment' entry date that would have been in the economic interests of both Pfizer and Ranbaxy." Br.54. But even assuming Appellants and their expert provided a model with such an "entry date," the fact remains that Appellants still would have had to show that FDA would have approved Ranbaxy's generic Lipitor before November 30, 2011—more specifically, by whatever earlier "entry date" the model generated. Put differently, suppose that Appellants' "expert economic model" estimated a "'no-payment' entry date" of August 15, 2011. Per *Wellbutrin*, Appellants still would have to show, through "specific or concrete evidence" rather than "speculation," that it is "more likely than not" that FDA "*would* have" approved Ranbaxy's generic Lipitor ANDA on or before August 15. 868 F.3d at 167 & n.57. As demonstrated herein, Appellants have failed to do so—indeed, have failed to show that FDA would have approved Ranbaxy's ANDA before November 30, 2011. There is no reason to allow years of "full discovery," presentation of "expert economic model[s]," and sprawling omnibus motions when Appellants cannot satisfy a dispositive threshold requirement.

In the end, Appellants' complaints about the district court's purported "restrictions on discovery," "misunderstanding of the causation issue," and failure to "provid[e] full discovery on the relevant issues," Br.55, arise from their continued refusal to accept *Wellbutrin*. But *Wellbutrin* controls here, and it requires summary judgment if Appellants cannot show that the "regulatory or legislative bar" preventing marketing of generic Lipitor would have been broken by FDA approval before November 30, 2011. Because Appellants have provided only speculation that FDA could have approved generic Lipitor before November 30, 2011, rather than specific evidence that FDA would have provided such approval, summary judgment was appropriate.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

GEORGE W. HICKS, JR.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

s/ Devora W. Allon
JAY P. LEFKOWITZ
DEVORA W. ALLON, P.C.
GILAD BENDHEIM
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for Appellees Ranbaxy Inc., Ranbaxy Laboratories Limited, and Ranbaxy Pharmaceuticals, Inc.*

December 30, 2024

## COMBINED CERTIFICATIONS

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to L.A.R. 28.3(D), I certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 12,988 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14 pt. Times New Roman, a proportionally spaced typeface, using Microsoft Office Word.

## CERTIFICATE REGARDING ELECTRONIC FILING

Pursuant to L.A.R. 31.1(C), I certify that an electronic version of this brief, in PDF format, was filed; that the text of the electronic version is identical to the text in the paper copies; and that CrowdStrike Windows Sensor version 7.17.18721.0 has been run on the file and no virus was detected.

December 30, 2024

s/Devora W. Allon
Devora W. Allon, P.C.

## CERTIFICATE OF SERVICE

I hereby certify that, on December 30, 2024, an electronic copy of the foregoing Appellees' Response Brief was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

s/ Devora W. Allon, P.C.
Devora W. Allon, P.C.